UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

| | | |
|---|---|---|
| DEBRA WRIGHT,<br><br>Plaintiff,<br><br>v.<br><br>HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY, *et al.*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 3:25-CV-297-CHB<br><br>**MEMORANDUM OPINION AND ORDER** |

*** *** *** ***

This matter is before the Court on the Motion to Dismiss Plaintiff's First Amended Complaint ("Motion to Dismiss") filed by Defendants Sazerac Company, Inc. Health and Welfare Benefit Plan, Sazerac Distillers, LLC, Sazerac Company, Inc., and Sazerac Company (collectively, the "Sazerac Defendants"), [R. 17], and the Motion to Dismiss Count I of the Amended Complaint ("Motion to Dismiss") filed by Defendant Hartford Life and Accident Insurance Company ("Hartford Life"), [R. 18]. Plaintiff Debra Wright has filed a response to each motion, [R. 19], [R. 20], and the defendants have replied, [R. 21], [R. 22]. This matter is therefore fully briefed and ripe for review. For the reasons set forth below, the Court will grant the motions to dismiss.

## I. BACKGROUND

Plaintiff has been an employee of Sazerac Distillers, LLC and Sazerac Company, Inc. since August 2020.[1] [R. 15, ¶¶ 16, 18]. Through her employment, Plaintiff was permitted to purchase certain employee benefits under the Sazerac Company, Inc. Health and Welfare Benefit Plan ("the Plan"), which is an "employee welfare benefit plan established under the Employee Retirement

---

[1] Plaintiff alleges that she is an employee of "Sazerac Distillers, LLC, Sazerac Company, Inc. and/or Sazerac Company." [R. 15, ¶ 16]. In their motion, the Sazerac Defendants clarify that Sazerac Company, Inc. and Sazerac Company are the same entity. [R. 17, p. 6].

Income Security Act" ("ERISA"). *Id.* ¶¶ 5, 19. The Plan is governed by a Plan document, which in turn incorporates the applicable insurance policies and plan booklets. *See* [R. 17-2, pp. 9, 136 (2011 Plan Document)]; [R. 18-2, pp. 16, 104 (2024 Plan Document)].[2]

Among the benefits selected by Plaintiff was a dependent life insurance policy for her husband, Dannie Wright, under which she was the beneficiary. *Id.* ¶¶ 20, 21. The Sazerac Defendants "insured the dependent life coverage by purchasing a group insurance policy ('the Policy') from" Hartford Life. *Id.* ¶ 23. In its "Benefits" section, the Policy explained, "If You or Your Dependents die while covered under The Policy, We will pay the deceased person's Life Insurance Benefit after We receive Proof of Loss." [R. 18-4, p. 25].[3] *Id.* at 25. Another section of the Policy, the "Period of Coverage" section, explains when coverage for a dependent ends. *Id.* at 22. That section expressly states that coverage for a dependent ends "the date the Dependent no longer meets the definition of Dependent . . . unless continued in accordance with the Continuation Provisions" of the Policy. *Id.* "Dependents" is defined elsewhere in the Policy as "Your Spouse and Your Dependent Child(ren)." *Id.* at 32. "Spouse" is defined as "Your spouse who . . . is not legally separated or divorced from You . . . ." *Id.* at 33.

On November 8, 2023, a Final Decree & Dissolution of Marriage was entered in Taylor Circuit Court, finalizing Plaintiff and Dannie Wright's divorce. [R. 15, ¶ 25]. At some point after the divorce was finalized, Plaintiff contacted the Sazerac Defendants' human resources office about the divorce. *Id.* ¶ 26. Specifically, she "inquired with the human resources office about what

---

[2] Plaintiff's Amended Complaint and briefing cite to the 2024 Plan document, which became effective January 1, 2024 and was in place at the time Plaintiff filed her benefits claim. *See* [R. 15]; [R.19]; [R. 20]. The defendants cite to both the 2024 Plan and the 2011 Plan, which was in place at the time of Plaintiff's divorce. *See, e.g.*, [R. 17]; [R. 18]. The parties do not dispute that "[t]he two versions of the Plan . . . contain the same basic provision concerning eligibility and continuation coverage." [R. 17, p. 7 n.6]. Accordingly, under either version of the Plan, the Court's analysis is the same.

[3] To the extent the page number on a filing differs from the page number assigned by the Court's electronic docketing system, the Court refers to the page number assigned by the electronic docketing system.

needed to be done about her employee benefits as a result of the divorce." *Id.* ¶ 27. Plaintiff was then given a phone number to call, presumably the Sazerac Defendants' benefits support phone number. *Id.* ¶ 29. Upon calling this number and "inquir[ing] about what needed to be done about her employee benefits as a result of the divorce," Plaintiff was advised that "she could not stop the elections that had been made for the dependent life insurance coverage on Dannie Wright." *Id.* ¶¶ 31, 33. She was also told that "the premiums would continue to be deducted from her paycheck for the dependent life coverage until the next open enrollment period in November 2024," and "the dependent life insurance would remain in force until that time." *Id.* ¶¶ 34–35. Thereafter, Plaintiff continued to make premium payments, which were deducted from her paycheck. *Id.* ¶¶ 38, 41.

On July 24, 2024, Dannie Wright died. *Id.* ¶ 43. At that time, Plaintiff had been making regular premium payments on the life insurance policy and "fully expected coverage to be in force." *Id.* ¶¶ 44–47. She contacted the Sazerac Defendants' human resources office to notify them of Dannie Wright's death and to request "information about how to initiate a claim for dependent life benefits." *Id.* ¶ 48. She was told that her life insurance claim would be denied. *Id.* ¶ 50. The Sazerac Defendants ultimately refunded the premium payment by including the refunded amount in Plaintiff's paycheck, "without Plaintiff's knowledge" or request. *Id.* ¶¶ 51–53.

A meeting was then held with Plaintiff and two of the Sazerac Defendants' human resources employees. *Id.* ¶¶ 53. One of the human resources officers "admitted to Plaintiff that a mistake had been made by employees and/or agents of the Sazerac Defendants with regard to information they had provided Plaintiff about the dependent benefits in response to her inquiries and requests for information about the benefits." *Id.* ¶ 54. He further explained that "her life insurance claim would nonetheless be denied." *Id.* ¶ 55.

Plaintiff proceeded to submit a claim form. *Id.* ¶¶ 57–62. Hartford Life denied the claim,

explaining that "[t]he information reviewed indicated Dannie Wright was divorced at the time of his death. Therefore, his insurance terminated on the date of divorce." *Id.* ¶¶ 64–65. Plaintiff appealed the denial, and Hartford Life denied the appeal. *Id.* ¶¶ 68–69. Hartford Life explained that

> [a] review of the evidence contained in the claim file documents that Debra and Dannie Wright were divorced at the time of his death on 07/24/2024. Therefore, in accordance with the Policy's provisions, Dannie Wright would not meet the Policy definition of a Spouse and therefore would not be eligible to be covered as a Spouse under this Policy as of the time of his death.

*Id.* ¶ 70.

On May 23, 2025, Plaintiff filed this action. [R. 1]. In her Amended Complaint, filed August 22, 2025, she brings a claim under 29 U.S.C. § 1132(a)(1)(B) against Hartford and the Plan (but no other Sazerac Defendants) "to recover benefits under the terms of the Plan and Policy" (Count I), and a claim under 29 U.S.C. § 1132(a)(3) against all Sazerac Defendants "for breach of fiduciary duty and other equitable relief" (Count II). [R. 15, ¶¶ 85–135]. The Sazerac Defendants have filed a motion seeking dismissal of both claims, [R. 17], and Hartford Life has likewise filed a motion to dismiss Count I, the only claim asserted against it. [R. 18]. Both motions are fully briefed and ripe for review. [R. 19]; [R. 20]; [R. 21]; [R. 22].

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a party may move for dismissal for "failure to state a claim upon which relief may be granted." To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is "plausible on its face" if the factual allegations in the complaint "allow the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Determining if a complaint sufficiently alleges a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (citation omitted). Further, "[t]he complaint is viewed in the light most favorable to [Plaintiff], the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in [Plaintiff's] favor." *Gavitt v. Born*, 835 F.3d 623, 639–40 (6th Cir. 2016) (citing *Jelovsek v. Bredesen*, 545 F.3d 431, 434 (6th Cir. 2008)).

## III. ANALYSIS

### A. Preliminary Matters

As an initial matter, Plaintiff contends that "ERISA denial-of-benefits claims are particularly inappropriate for motions to dismiss because they are normally decided after production of the administrative record and motions for judgment on the administrative record." [R. 19, p. 6]; *see also id.* at 2, 12. However, she fails to cite any case law supporting this position. Instead, she cites *Wilkins v. Baptist Healthcare System, Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (6th Cir. 1998)), a case often cited for the "general rule" that "a district court should base its review of an ERISA-based claim of an alleged denial of benefits solely upon the administrative record." *Busch v. Hartford Life and Accident Ins. Co.*, No. 97-5074, 2010 WL 3842367, at *1 (E.D. Ky.

Sept. 27, 2010) (citing *Wilkins*, 150 F.3d at 619); *see also Bustetter v. Standard Ins. Co.*, No.18-1-DLB-EBA, 2018 WL 11375143, at *2 (E.D. Ky. Oct. 23, 2018). But the *Wilkins* case does not discuss whether or under what circumstances motions to dismiss could be decided in the ERISA context.

However, "[i]n the context of ERISA, the Supreme Court has noted that motions to dismiss under [Rule] 12(b)(6) are 'important mechanism[s] for weeding out meritless claims' and that courts should therefore engage in a 'careful, context-sensitive scrutiny of a complaint's allegations.'" *Smith v. Humana, Inc.*, No. 3:25-CV-00727-GNS, 2026 WL 2103411, at *2 (W.D. Ky. July 21, 2026) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). In this case, the defendants are not seeking judgment on the administrative record and are instead arguing that, on the face of the Amended Complaint, Plaintiff has failed to state a claim for relief. Plaintiff has failed to cite any law suggesting that it would be inappropriate to consider this Rule 12(b)(6) motion simply because this is an ERISA matter.

Moreover, to the extent Plaintiff argues that the Court should set deadlines for the defendants to produce the administrative record and then allow the parties to move for judgment on that record, Plaintiff fails to point to any additional information in that record that could affect the outcome of this case. *See* [R. 19, p. 12]. And while Plaintiff argues in a footnote that it is "unclear whether [Hartford Life] has included all the pertinent Plan documents as attachments to its motion," *id.* at 12 n.7, the Court has no reason to believe—and Plaintiff provides no reason to suggest—that the Plan and Policy documents attached to that motion are incomplete, nor does Plaintiff dispute that these are the relevant provisions of the Plan and Policy documents. *See* [R. 18-2]; [R.18-3]; [R. 18-4].

The Court addresses one final preliminary issue. Plaintiff does not attach any of the relevant documents (e.g., the Policy or Plan) to her complaints, *see* [R. 1], [R. 15]; however, the defendants have filed those documents in the record. *See* [R. 17-1 (Plan Excerpts)]; [R. 17-2 (2011 Plan)]; [R. 18-2 (2024 Plan); [R. 18-4 (Policy)]. Generally, "matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss." *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002) (internal quotations omitted). However, exceptions to this general rule include documents "attached to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and central to the plaintiff's claim." *Id.* at 745. Because the Policy and Plan documents are referenced in the Amended Complaint and are clearly central to Plaintiff's claims, the Court can refer to these documents when ruling on the pending motions.

Having addressed these preliminary matters, the Court now turns to the pending motions to dismiss.

### B. Count I – Plaintiff's Claim for Benefits Under 29 U.S.C. § 1132(a)(1)(B) Against Hartford Life and the Plan

In Count I of her Amended Complaint, Plaintiff seeks recovery against both Hartford Life and the Plan under 29 U.S.C. § 1132(a)(1)(B). [R. 15, ¶¶ 85–95]. That provision of ERISA's civil enforcement statute allows a participant or beneficiary to bring a civil action "to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). In the present case, Plaintiff seeks to recover benefits that she argues are owed to her under the Policy. Specifically, Plaintiff alleges that "Dannie Wright's death satisfies the insurance Policy's and the Plan's definitions and condition for payment of dependent life insurance," and thus, "[u]nder the Plan and Policy, Hartford [Life] and the Plan are obligated to

pay claims resulting from the death of Dannie Wright." [R. 15, ¶¶ 89–90]. In response, both Hartford Life and the Plan argue that this claim must be dismissed because, based on the allegations in the Amended and Complaint and the plain language of the Plan and the Policy, Plaintiff was not entitled to any such benefits. *See* [R. 17]; [R. 18].

In determining whether benefits were due under the Plan and Policy, the Court first turns to the language of those documents. *See Farhner v. United Transp. Union Discipline Income Protection Program*, 645 F.3d 338, 343 (6th Cir. 2011) ("[I]n determining whether benefits were due under the Plan, the starting point is the language of the Plan itself." (citations omitted)). Unless that language is ambiguous, the Court "presume[s] the policy means what it says and therefore give[s] effect to its 'plain meaning in an ordinary and popular sense.'" *Fulkerson v. Unum Life Ins. Co. of America*, 36 F.4th 678, 681 (6th Cir. 2022) (quoting *Farhner*, 645 F.3d at 343).

In the present case, Plaintiff alleges in her Amended Complaint that the Plan and Policy terms "are ambiguous as to whether Plaintiff's election of dependent life coverage would continue for the entire plan year after her divorce from Dannie Wright." [R. 15, ¶ 114]. She does not identify any specific provision that she believes is ambiguous, however. Moreover, "a policy is ambiguous only if it 'is susceptible to multiple reasonable interpretations, not just because clever lawyers can disagree over the meaning of terms." *Fulkerson*, 36 F.4th at 681 (quoting *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 269 (6th Cir. 2018)). For the reasons set forth below, the Court finds that the terms of the Policy and Plan are unambiguous.

First, the plain language of the Policy makes clear that coverage for a dependent ends "the date the Dependent no longer meets the definition of Dependent," or the date the dependent is no longer the "Spouse [or] Dependent Child(ren)" of the insured, unless the coverage is otherwise "continued in accordance with [the Policy's] Continuation Provisions." [R. 18-4, p. 22]. Spouse,

in turn, is defined as a spouse that "is not legally separated or divorced from" the employee. *Id* at 33. Thus, under the plain and unambiguous language of the Plan and Policy, coverage for a spouse terminates when that person is legally separated or divorced from the employee, unless coverage is continued under one of the Continuation Provisions.

Plaintiff does not appear to dispute this point. *See* [R. 20, p. 7]. That is, she does not dispute that coverage for Dannie Wright would have terminated at the time of their divorce, but she argues that certain Continuation Provisions apply in this case, allowing coverage to continue beyond that termination date. *See, e.g.*, *id.* at 7–8. The Policy's Continuation Provisions section (which immediately follows the section regarding the termination of a dependent's coverage) addresses whether coverage for an employee and her dependents can "be continued beyond the date it would otherwise terminate." [R 18-4, p. 22]. Plaintiff relies on that portion of the Continuation Provisions section stating that "[c]overage can be continued by Your Employer beyond a date shown in the Termination provision, if Your Employer provides a plan of continuation which applies to all employees the same way." *Id.* The Policy then lists out several Continuation Provisions applying to leaves of absence, temporary layoffs due to lack of work, disability insurance, absences due to sickness or injury, Family and Medical Leave Act absences, and military leave absences. *Id.* at 22–23.

Plaintiff argues that her employer *did* provide a plan of continuation applicable to all employees in the same way, but she does not cite to any of the provisions listed in the Continuation Provisions section of the Policy (nor does it appear that any are applicable). Instead, Plaintiff cites Section 5.8 of the 2024 Plan. [R. 19, pp. 7–8] [R. 20, pp. 7–8]; *see also* [R. 15, ¶¶ 77–83]. That section is found in Article V of the 2024 Plan. Article V governs elections and provides information about enrollment for non-elective and elective benefits, forms and agreements

governing enrollment and elections, deadlines for enrollment and elections, and similar topics. *See* [R. 18-2, pp. 31–37].

The specific section cited by Plaintiff, Section 5.8, is titled "Changing Elections." [R. 18-2, p. 31]. Section 5.8(A) explains that employees "may make new benefit elections or change existing ones for the forthcoming Plan Year" during annual enrollment; otherwise, "[a]ll elections . . . stay in force during the entire Plan Year to which they apply unless changed or revoked as provided in this Section 5.8." *Id.* at 33. Section 5.8(C) goes on to explain how and under what circumstances an employee may revoke an election. *Id.* at 34. Plaintiff relies specifically on Section 5.8(C)(2), which provides that a covered employee "may revoke any election and make a new one if such revocation and new election are both on account of and necessary or appropriate because of a Change in Status." *Id.*; *see also* [R. 20, p. 7]. A "Change in Status" is defined in the 2024 Plan to include, among other things, "[t]he Employee's marriage, divorce, legal separation, or annulment." [R. 18-2, p. 12].

Relying on these provisions, Plaintiff argues that, upon her divorce from Dannie Wright, she had "the option to revoke the election . . . [for dependent life benefits] for the year," but she "[was] not required to do so." [R. 20, p. 8]. Because she did not revoke the election for dependent life benefits, she argues, "the benefits stayed in place until open enrollment in November 2024." *Id.* Thus, she argues, "[b]ecause Dannie Wright died while coverage was in place, Hartford [Life] is obligated to pay the claim under 29 U.S.C. [§] 1132(a)(1)(B)." *Id.*

Hartford Life and the Plan disagree. These defendants argue that Section 5.8 governs elections (and specifically the revocation of elections), and it simply provides an exception to the general rule that an employee may only make new elections or change existing elections during annual enrollment. *See, e.g.*, [R. 18-1, p. 8]; [R. 21, p. 7]. Importantly, they argue, that exception

is only triggered in the event the employee gains or loses eligibility for coverage under that election. *See, e.g.*, [R. 17, p. 14]; [R. 18-1, pp. 9–10]. For support, they cite to Section 5.8(C)(2), which, as noted above, provides that an employee may revoke an election (and make new elections) so long as the revocation (or new election) is due to a "Change in Status." [R. 18-2, p. 34]. However, as Hartford Life and the Plan point out, this subsection goes on to state that any election changes "must be consistent with the Change in Status," meaning "the Change in Status event must cause the Employee or Employee's Spouse or dependent children to gain or lose eligibility under an employer-sponsored benefit offered through this Plan." *Id.* Thus, they argue, Plaintiff was only entitled to *revoke* the dependent life benefits election upon her divorce because that divorce rendered her *ineligible* to receive those benefits. *See, e.g.*, [R. 17, p. 14]; [R. 18-1, pp. 9–10]. And the fact that she did not expressly revoke that election did not affect her eligibility. *See, e.g.*, [R. 17, p. 14]; [R. 18-1, pp. 9–10]. Instead, they argue, her eligibility to receive the dependent life benefits was governed by the terms of the Policy, and the Policy clearly provides that coverage terminated upon divorce. Stated another way, they argue that, regardless of whether she affirmatively revoked the election pursuant to Section 5.8(C)(2), she was ineligible to receive those benefits (i.e., they terminated) at the time of the divorce.

In response to these arguments about eligibility, Plaintiff cites Section 3.3 of the 2024 Plan. *See, e.g.*, [R. 20, p. 9]. That provision explains, in relevant part, that "for all Plan benefits other than medical, dental, and vision," coverage ceases on the "date on which the Covered Employee last satisfies the eligibility and participation requirements of Sections 3.1 and 3.2." [R. 18-2, p. 20]. Sections 3.1 and 3.2 then go on to discuss an employee's eligibility to participate in the Plan. *Id.* at 18–19. Because she was eligible to participate in the Plan (i.e., was an employee regularly scheduled to work at least thirty hours per week), Plaintiff argues that she remained eligible to

receive her elected benefits. *See, e.g.*, [R. 20, p. 9].

But Plaintiff misses the point. Section 3 governs an employee's eligibility to participate in the Plan; it does *not* address an employee's eligibility to receive specific elected benefits. Indeed, Section 3.1 expressly provides that "[s]pecific eligibility requirements for certain benefits shall be set forth in Article IV or in the applicable Incorporated Documents." [R. 18-2, p. 18]. Article IV, in turn, discusses various benefits, including dependent life benefit coverage. *Id.* at 25–30. It explains that covered employees "shall have the right to the dependent life insurance benefits described in the applicable Incorporated Document. Such benefits shall be subject to the terms, conditions, and limitations set forth in such Incorporated Document." *Id.* at 27. The "Incorporated Document" includes the Policy. *Id.* at 16 (defining Incorporated Document). Thus, to determine Plaintiff's eligibility for dependent life benefits, the Court looks to the Policy documents.

As already explained, under the plain language of the Policy, coverage for a dependent ends "the date the Dependent no longer meets the definition of Dependent," or in other words, the date the dependent is no longer the "Spouse [or] Dependent Child(ren)" of the insured, unless the coverage is otherwise "continued in accordance with [the Policy's] Continuation Provisions." [R. 18-4, pp. 22, 32]. Spouse, in turn, is defined as a spouse that "is not legally separated or divorced from" the employee. *Id* at 33. Thus, in this case, coverage for Dannie Wright terminated when he and Plaintiff were divorced unless coverage was continued under one of the Policy's Continuation Provisions.

Again, Plaintiff does not dispute this point. But to the extent she attempts to argue that coverage *did* continue, she fails to cite to any applicable Continuation Provision. The Policy lists several such provisions[4]; however, Plaintiff does not rely on any of those provisions and instead

---

[4] The Plan also includes a section, Article VII, related to "continuation coverage," which discusses an employee's eligibility to purchase continuation coverage for medical, dental, vision, health care spending accounts, and employee

cites to Section 5.8 of the 2024 Plan. Her reliance on Section 5.8 is misplaced. That provision is found within an article that governs elections, and it makes no mention of continuation plans or continuation of coverage. *See* [R. 18-2, pp. 31–37]. Given the clear language of the policy, her proposed interpretation of these terms is not reasonable. *See generally Fulkerson*, 36 F.4th at 681 ("[A] policy is ambiguous only if it 'is susceptible to multiple reasonable interpretations, not just because clever lawyers can disagree over the meaning of terms.'" (quoting *Clemons*, 890 F.3d at 269)). Simply put, under the plain and unambiguous language of the Policy and the Plan, Section 5.8 is not a "plan of continuation which applies to all employees the same way," as contemplated by the Policy's Continuation Provisions section. [R 18-4, p. 22]. Instead, as the defendants point out, Section 5.8 governs elections and simply provides an exception to the general rule that an employee may only make new elections or change existing elections during annual enrollment. *See, e.g.*, [R. 18-1, p. 8]; [R. 21, p. 7].

In sum, the dependent life benefits coverage for Dannie Wright terminated when he and Plaintiff divorced, and as a result, Plaintiff cannot now recover those benefits. Accordingly, the Court will grant the Sazerac Defendant's Motion to Dismiss, [R. 17], to the extent it seeks dismissal of Count I, and will grant Hartford Life's Motion to Dismiss in full, [R. 18].

**C. Count II – Plaintiff's Claim for Breach of Fiduciary Duty Under 29 U.S.C. § 1132(a)(3) against the Sazerac Defendants**

In Count II of her Amended Complaint, Plaintiff seeks recovery against all Sazerac Defendants (the Plan, Sazerac Distillers, LLC, Sazerac Company, Inc., and Sazerac Company) under 29 U.S.C. § 1132(a)(3). [R. 15, ¶¶ 96–135]. That provision of ERISA's civil enforcement statute allows a participant, beneficiary, or fiduciary to bring a civil action to enjoin any act or

assistance plan benefits pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"). *See* [R. 18-2, p. 44–49]. Plaintiff does not rely on this provision, nor could she, as it does not apply to dependent life insurance.

practice which violations ERISA or to "obtain other appropriate equitable relief" to redress such violations or enforce any provision of ERISA or the terms of the plan. 29 U.S.C. § 1132(a)(3).

The Sazerac Defendants present several arguments in support of their position that the Court should dismiss Count II. First, they argue that this claim is an improper repackaging of Plaintiff's § 1132(a)(1)(B) claim. [R. 17, pp. 16–20]. Next, they argue that the mistaken information that Plaintiff received from the Sazerac Defendant's benefits hotline was not given in a fiduciary capacity and thus, it cannot constitute a breach of fiduciary duties. *Id.* at 20–23. The Sazerac Defendants also argue that Plaintiff has otherwise failed to allege the requisite elements of a § 1132(a)(3) claim, citing to the elements of equitable estoppel. *Id.* at 23–27. Lastly, these defendants argue that Plaintiff has failed to allege that she has suffered a cognizable harm entitling her to equitable relief. *Id.* at 27–30. Because the Court ultimately concludes that Plaintiff has failed to allege facts sufficient to allege an entitlement to the equitable relief listed in her Amended Complaint, the Court finds that she has failed to state a claim under § 1132(a)(3), and it will therefore grant the Sazerac Defendant's motion as to this claim, without considering the parties' other arguments.

Section 1132(a)(3) allows a successful plaintiff to "enjoin any act or practice which violates any provision of this subchapter or the terms of the plan" or "obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The "provision of 'other appropriate equitable relief' allows plaintiffs to obtain 'only those remedies that were typically available in equity.'" *Local 55 Trustees of the Iron Workers' Pension Plan*, No. 3:25 CV 1962, 2026 WL 693119, at *3 (N.D. Ohio Mar. 12, 2026) (quoting *Aldridge v. Regions Bank*, 144 F.4th 828, 845–46 (6th Cir. 2025)) (cleaned up). In *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011), the Supreme Court identified, in dicta, three such

equitable remedies available under § 1132(a)(3) for breach of a fiduciary duty: surcharge, reformation, and estoppel. *Id.* at 440–42; *see also Silva v. Metropolitan Life Ins. Co.*, 762 F.3d 711, 720 (8th Cir. 2014) (discussing *Amara*); *Rochow v. Life Ins. Co. of North America*, 780 F.3d 364, 375 n.4 ("The statements made by the Supreme Court in *Amara* regarding the equitable remedies available to courts under § [1132](a)(3) are merely dicta."). Courts have also recognized that equitable restitution may be appropriate in limited circumstances, i.e., if the restitution "involve[s] the imposition of a constructive trust or equitable lien on 'particular funds or property in the [defendant's] possession.'" *Local 55 Trustees*, 2026 WL 693119, at *3 (quoting *Hall v. Liberty Life Assur. Co.*, 595 F.3d 270, 274–75 (6th Cir. 2010) (internal quotation marks omitted).

In the present case, the prayer for relief in Plaintiff's Amended Complaint lists the following forms of relief with respect to her § 1132(a)(3) claim: "equitable relief . . . , including but not limited to surcharge, estoppel, for unjust enrichment, and for reformation of the plan to provide for benefits consistent with the statements made to Plaintiff." [R. 15, p. 16]. However, the Sazerac Defendants argue that, "[e]ven assuming arguendo that an agent or employee of the Sazerac Defendants was acting in a fiduciary capacity and that Plaintiff relied on the mistaken advice she was provided, Plaintiff has not alleged (and cannot allege) that she has suffered any type of harm cognizable under [§] 1132(a)(3)." [R. 17, p. 27]. More specifically, they argue that Plaintiff has not alleged a cognizable harm entitling her to equitable relief, and instead, "all Plaintiff seeks is legal relief in the form of the payment of her benefit claim." *Id.* at 30.

In response, Plaintiff points to the different equitable remedies she seeks, characterizing those remedies as "including but not limited to surcharge, estoppel, for unjust enrichment, and for reformation of the Policy and Plan to remedy the false and misleading information." [R. 20, p. 20].

These are the same equitable "remedies"[5] listed in her prayer for relief in her Amended Complaint, as noted above. *See* [R. 15, p. 16]. Plaintiff first argues that, at this stage of the proceedings, it is premature to dismiss these potential remedies. [R. 20, pp. 20–21]. Nevertheless, Plaintiff goes on to address the remedies of surcharge and equitable estoppel, *id.* at 21–23, ultimately concluding that "[t]he pleadings meet the standard for stating a claim for equitable relief." *Id.* at 23.

The Court first considers Plaintiff's argument that it is improper to dismiss a complaint on these grounds and instead, Sixth Circuit case law mandates that "the district court should determine which remedies are appropriate after addressing the case on the merits." *Id.* at 20. But Plaintiff fails to cite any relevant authority to support this position. Instead, Plaintiff cites *Stiso v. International Steel Group*, 604 F. App'x 494 (6th Cir. 2015), and *Brown v. United of Omaha Life Insurance Co.*, 661 F. App'x 852 (6th Cir. 2016). *See* [R. 20, p. 20]. But both of those cases were resolved at the summary judgment stage. And neither can be read to prohibit a district court from considering, at the motion to dismiss stage, whether an ERISA plaintiff has sufficiently alleged a claim for equitable relief.[6] Moreover, district courts in this and other circuits have considered this issue at the motion to dismiss stage and have, when appropriate, granted motions to dismiss on this basis. *See Trout v. Meijer, Inc.*, No. 1:15-cv-1378, 2026 WL 1098213, at *15 (W.D. Mich. Apr. 23, 2026); *Alliance Coal, LLC v. Smith*, No. 0:26-CV-10-REW-EBA, 2026 WL 353029, at *7–8 (E.D. Ky. Feb. 9, 2026); *Lance v. Ford Motor Co.*, No. 08-1829, 2009 WL 1133456, at *4–12 (E.D. Mich. Apr. 27, 2009); *see generally Higgins v. Lincoln Electric Co., Inc.*, No. 23-5862, 2025 WL 213846 (6th Cir. Jan. 16, 2025) (affirming dismissal of ERISA equitable estoppel claim).

---

[5] As discussed in more detail below, "unjust enrichment" is not typically considered a *remedy*; instead, equitable restitution may be an appropriate remedy when a defendant has been unjustly enriched.

[6] To the extent the Sixth Circuit in *Stiso* suggested that "make-whole relief in the form of money damages" might be an appropriate equitable remedy on remand, it was referring to surcharge, which the Sixth Circuit has since said is unavailable under § 1132(a)(3), as discussed in more detail herein. *See infra* Section III(C)(1) (discussing *Aldridge v. Regions Bank*, 144 F.4th 828 (6th Cir. 2025)).

Accordingly, the Court will now go on to consider whether Plaintiff has plausibly alleged facts sufficient to support her request for equitable relief under § 1132(a)(3). Before doing so, however, the Court notes that Plaintiff's prayer for relief specifically references equitable remedies "including but not limited to" surcharge, estoppel, reformation, and "for unjust enrichment." [R. 15, p. 16]. And Plaintiff's briefing seems to suggest that other equitable remedies could potentially be available. *See* [R. 20, p. 21]. But other courts have concluded that it is insufficient to merely include a "catch-all" request for equitable relief in one's prayer for relief. *See Lance*, 2009 WL 1133456, at *11 ("[The defendant] also says that [the plaintiffs'] generic request for an 'order of equitable relief the Court deems necessary' does not save their ERISA claim from dismissal since it is nothing more than a request for compensatory damages. The Court agrees. Plaintiffs do not identify any other type of equitable relief to which they are entitled and the Court cannot discern any."). The Court therefore considers the specific remedies sought by Plaintiff, beginning with surcharge.

**1. Surcharge**

As noted above, the Supreme Court in *Amara* "identified [in dicta] a range of equitable remedies potentially available under § 502(a)(1)(B), including surcharge." *Rochow*, 780 F.3d 364 at 375. In describing this remedy, the Supreme Court "suggested that equity courts could grant a beneficiary monetary compensation for a loss resulting from a trustee's breach of duty," and this "monetary remedy" was sometimes called a surcharge. *Aldridge v. Regions Bank*, 144 F.4th 828, 847 (6th Cir. 2025) (cleaned up). In the years following *Amara*, many courts relied on that decision and allowed ERISA plaintiffs to seek monetary surcharge awards against fiduciaries under § 1132(a)(3). *Id.* (citation omitted). At least one circuit, the Fourth Circuit, disagreed, however. *See id. T*he Sixth Circuit has recently followed the Fourth Circuit's reasoning to conclude that

surcharge is not an appropriate remedy for a § 1132(a)(3) claim. *Id.* at 849 ("[Section] 1132(a)(3) does not permit plan participants to seek monetary relief from fiduciaries for the losses that they suffer because of the fiduciaries' breach of their duties.").[7]

Relying on *Aldridge*, the Sazerac Defendants argue, albeit briefly, that the Court does not have authority to award a surcharge remedy to Plaintiff under § 1132(a)(3). *See* [R. 17, p. 28]; *see also* [R. 22, p. 15]. In response, Plaintiff wholly fails to consider the analysis in *Aldridge* and merely concludes that, although she, too, seeks surcharge, her claim is different than the plaintiff in *Aldridge* because she "does not seek impermissible 'money damages' as a surcharge." [R. 20, p. 21]. She provides no further explanation, however, as to how her request for surcharge can be described as anything other than a request for money damages. As noted above, surcharge *is* "monetary compensation for a loss resulting from a trustee's breach of duty." *Aldridge*, 144 F.4th at 847. The question then, is not whether Plaintiff seeks money damages (as surcharge), but whether those damages are an available equitable remedy under § 1132(a)(3), or whether they instead constitute an impermissible legal remedy.

The Sixth Circuit has stated in *Aldridge* that this remedy is unavailable under § 1132(a)(3). *Id.*at 849 ("[Section] 1132(a)(3) does not permit plan participants to seek monetary relief from fiduciaries for the losses that they suffer because of the fiduciaries' breach of their duties."). As *Aldridge* remains binding authority at this time, it precludes Plaintiff from obtaining surcharge under § 1132(a)(3). *See Trout*, 2026 WL 1098213, at *15 (discussing *Aldridge* and concluding that it bars the plaintiff's claim for surcharge under § 1132(a)(3)); *Alliance Coal*, 2026 WL 353029, at *8 (discussing *Aldridge* and concluding that "until either the Sixth Circuit or the

[7] A petition for writ of certiorari has been filed in this case but remains pending.

Supreme Court holds otherwise, [the plaintiff] cannot obtain a surcharge remedy under § [1132](a)(3)").

### 2. Estoppel

The Court next considers Plaintiff's proposed remedy of estoppel. However, before doing so, the Court briefly addresses a point of confusion raised in the briefing. In their motion, the Sazerac Defendants argue, in part, that Plaintiff has not alleged the requisite elements of her § 1132(a)(3) claim, and in doing so, they cite to an eight-part test applicable to equitable estoppel. [R. 17, pp. 23–27]. The plaintiff, in response, suggests (without citing any legal authority) that the eight-part test is applicable only when a stand-alone equitable estoppel claim is raised. *See* [R. 20, p. 21]. But, she argues, she brings a breach of fiduciary duty claim, and there is instead a three-part test applicable to that claim, which in turn requires a material misrepresentation, made in a fiduciary capacity, and detrimental reliance on that misrepresentation. *Id.* at 21; *see also James v. Pirelli Armstrong Tire Corp.*, 305 F.3d 439, 449 (6th Cir. 2002) (explaining that a plaintiff must show: "(1) that [the defendant was] acting in a fiduciary capacity when [it] made the challenged representations; (2) that these constituted material misrepresentations; and (3) that [the plaintiff] relied on those misrepresentations to [its] detriment" (citations omitted)).

There therefore appears to be some confusion between the parties as to whether, or at what point in the analysis, the three-part test (for breach of fiduciary duty claims) or the eight-part test (for equitable estoppel) applies when a plaintiff asserts a breach of fiduciary duty claim and seeks, among other things, estoppel. To be clear, if the Court were considering whether the plaintiff has alleged the standard elements of a breach of fiduciary duty claim under § 1132(a)(3), it would consider the three-part test cited above. *See, e.g.*, *Alliance Coal*, 2026 WL 353029, at *6 (considering whether the plaintiff failed to state a claim for breach of fiduciary duty under

§ 1132(a)(3) by considering the three-part test).

However, the Court today considers only whether the plaintiff has alleged sufficient facts showing her entitlement to available equitable relief. In resolving that specific issue, the Court considers, among other things, whether she has alleged facts sufficient to demonstrate the availability of equitable estoppel. Plaintiff cites no cases, and the Court has found none, suggesting that the test relied upon by Defendants would be inapplicable to the Court's estoppel analysis, simply because Plaintiff couches it as a request for relief, rather than a stand-alone claim. Indeed, the Sixth Circuit has commented that equitable estoppel "has sometimes been considered a doctrine that can apply in § 1132(a)(1)(B) actions to estop the plan from being enforced as written, sometimes a doctrine that can be used in § 1132(a)(3) to gain similar relief, and sometimes as a free-floating common-law cause of action under ERISA." *Briggs v. National Union Fire Ins. Co. of Pittsburgh, PA*, 774 F. App'x 942, 948 n.8 (6th Cir. 2019) (quoting *Julia v. Bridgestone/Firestone, Inc.*, 101 F. App'x 27, 31 (6th Cir. 2004)). And more recent Sixth Circuit case law fails to distinguish between one form or the other (i.e., whether equitable estoppel is requested as a remedy under § 1132(a)(3) or is brought as a stand-alone claim) when applying the test relied upon by the Sazerac Defendants. *Higgins*, 2025 WL 213846, at *1. The Court therefore considers the test applicable to requests for estoppel relief in the ERISA context.

In *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998), the Sixth Circuit outlined a five-part test applicable to equitable estoppel cases in the ERISA context, but held that "[p]rinciples of estoppel . . . cannot be applied to vary the terms of unambiguous plan documents; estoppel can only be invoked in the context of ambiguous plan provisions." *Id.* at 404. The Sixth Circuit later clarified that, "[w]hen a plan's terms are unambiguous, a plaintiff asserting ERISA-estoppel must establish the five elements of equitable estoppel recognized in *Sprague* and three

additional elements set forth in *Bloemker v. Laborers' Loc. 265 Pension Fund Bloemker*, 605 F.3d 436, 442–44 (6th Cir. 2010)." *Higgins*, 2025 WL 213846, at *1.

The Sixth Circuit articulated these eight elements in its recent decision in *Higgins*:

> The eight elements require a showing of: (1) conduct or language amounting to a representation of material fact; (2) awareness of the true facts by the defendant; (3) intent by the defendant that the representation be acted upon; (4) unawareness of the true facts by the plaintiff; (5) detrimental and justifiable reliance by the plaintiff; plus (6) a written representation; (7) plan provisions which, although unambiguous, did not allow for individual calculation of benefits; and (8) extraordinary circumstances.

*Id.* at *2. When a plaintiff fails to allege one or more of these essential elements, a district court may dismiss "the ERISA-estoppel claim." *Id.*; *see also Alliance Coal*, 2026 WL 353029, at *7.

As the Court has already explained, the Plan's relevant terms are unambiguous. *See supra* Section III(B). Thus, to the extent Plaintiff seeks to invoke the doctrine of equitable estoppel with respect to her § 1132(a)(3) claim, she must allege facts sufficient to satisfy the eight-part test recited above. As to these elements, the Sazerac Defendants argue that the alleged misrepresentation was oral, not written; regardless, Plaintiff has not alleged *detrimental* reliance because she could not, as a matter of law, have obtained alternative life insurance on her ex-husband as alleged; and Plaintiff has not alleged *justifiable* reliance on the alleged oral misrepresentations because she the written plan documents were clear and unambiguous. [R. 17, pp. 23–27]; *see also* [R. 22, pp. 12–15].

The Court need not wade into the weeds of these arguments, however, because it is clear that Plaintiff has not alleged other necessary elements of the estoppel test. For instance, "[t]he Sixth Circuit has interpreted the second element—whether the party to be estopped was aware of the true facts—as 'requiring the plaintiff to demonstrate either intended deception or such gross negligence as to amount to constructive fraud.'" *Ted Williams Enterprises, LLC v. Palmer*, No.

4:20-CV-01018, 2021 WL 1214833, *3 (N.D. Ohio Mar. 31, 2021) (quoting *Deschamps v. Bridgestone Americas, Inc. Salaried Employees Ret. Plan*, 840 F.3d 267, 274 (6th Cir. 2016)) (cleaned up); *see also Higgins*, 2025 WL 213846, at *2 (explaining that the plaintiff "did not plead facts showing that [the defendant] knew the true facts and intended to deceive him or acted with gross negligence akin to constructive fraud" (citing *Zirbel v. Ford Motor Co.*, 980 F.3d 520, 525 (6th Cir. 2020); *Crosby v. Rohm & Haas Co.*, 480 F.3d 423, 431 (6th Cir. 2007))). Plaintiff has made no such allegations. Nor has Plaintiff plausibly alleged that the Sazerac Defendants intended that she rely on the misstatement, or that they stood to gain from her reliance. *Higgins*, 2025 WL, at *2. Lastly, the Court finds that Plaintiff has failed to allege extraordinary circumstances, "such as affirmative misconduct or repeated assurances[] that would override the unambiguous plan language." *Id.* Because Plaintiff does not plausibly allege multiple elements of the eight-element estoppel test, she has failed to allege her entitlement to this relief.

**3. Reformation**

Plaintiff has also asked the Court to "reform the terms of the Plan to conform to the promises and statements made to Plaintiff that coverage would remain in force for payment of premiums, which were duly paid." [R. 15, ¶ 116]; *see also id.* at 16 (seeking, among other forms of relief, "reformation of the [P]lan to provide for benefits consistent with the statements made to Plaintiff"). Plaintiff states that after the Plan is reformed, "Plaintiff is entitled to benefits under the terms of the reformed plan." *Id.* ¶ 117. She does not address this specific type of relief in her briefing, however. *See* [R. 20].

Reformation is a potential equitable remedy available under § 1132(a)(3). *See Pearce v. Chrysler Grp. LLC Pension Plan*, 893 F.3d 339, 346–47 (6th Cir. 2018).[8] It is "the judicial

[8] The Sixth Circuit in *Pearce* noted that reformation could be analyzed under either trust or contract law, but it did not need to "definitively decide the question" in that case because the parties had not objected to the lower court's

reforming or re-writing of a document, such as a contract, to make that document reflect the true agreement of the parties." *Id.* at 347 (citation omitted). A contract can be reformed in two instances: "(1) where there is a 'mutual mistake of both parties'; or (2) 'where one party is mistaken and the other commits fraud or engages in inequitable conduct.'" *Collins v. Ford Motor Co.*, No. 22-11348, 2023 WL 12176448, at *9 (E.D. Mich. Sept. 29, 2023) (quoting *Pearce*, 89 F.3d at 348). This requirement of fraud or inequitable conduct "roughly mirrors the fraud element of equitable estoppel." *Pearce*, 89 F.3d at 348. With that principle in mind, the Sixth Circuit has found such fraud

> "in the ERISA context where there is: (1) an information asymmetry, such that the defendant is the only one who knows the true facts and the plaintiff cannot ascertain the true facts; (2) the defendant misrepresents the benefits to which the plaintiff is entitled; and (3) the plaintiff investigated her benefits and drew a reasonable conclusion about them on the basis of the defendant's misrepresentations."

*Collins*, 2023 WL 12176448, at *9 (quoting *Pearce*, 893 F.3d at 349).

In the present case, Plaintiff has not plausibly alleged such fraud or inequitable conduct, as those terms have been interpreted in the ERISA context. At most, she alleges that an agent of the Sazerac Defendants provided her with incorrect information when she called its benefits hotline. But she does not allege that she lacked access to the Plan documents (i.e., that she could not ascertain the true facts), or that she undertook an investigation into her benefits and drew a reasonable conclusion about those benefits based on the misrepresentation. As such, she has failed to allege that reformation is appropriate because "one party is mistaken and the other commits fraud or engages in inequitable conduct." *Pearce*, 893 F.3d at 349; *cf. Collins*, 2023 WL 12176448, at *9 (declining to dismiss claim for reformation where the plaintiff had alleged that he did not have access to the Plan instrument, that he relied on the defendant's oral and written

---

application of contract principles. *Pearce*, 89 F.3d at 347. The Sixth Circuit has continued to consider the same principles in more recent cases. *See Briggs*, 774 F. App'x at 949.

misrepresentations, and the defendant had failed to correct or address the misrepresentation over the course of twenty-nine years).

Nor has Plaintiff alleged facts sufficient to show mutual mistake. "[F]or reformation to be "appropriate equitable relief" under § 1132(a)(3), the mutual mistake must be such that it prevented the complaining participant or beneficiary from obtaining a benefit to which he/she was entitled under the plan *as written*." *Strang v. Ford Motor Co. General Ret. Plan*, No. 14-CV-14410, 2015 WL 13541159, at *3 (E.D. Mich. Oct. 2, 2015) (emphasis in original). But here, Plaintiff has alleged a unilateral mistake by a representative of the Plan that is inconsistent with the written plan. Reformation is not available under these facts, as alleged in the Amended Complaint. *See Strang*, 2015 WL 13541159, at *3.

**4. Unjust Enrichment (Restitution)**

Plaintiff also seeks relief based on the Sazerac Defendants' alleged unjust enrichment. [R. 15, p. 16]. From the best the Court can tell, Plaintiff seeks restitution. Restitution for a defendant's unjust enrichment may constitute an appropriate form of equitable relief under § 1132(a)(3), but only when the restitution is equitable. *Alexander v. Bosch Auto. Sys.*, 232 Fed. App'x 491, 500 (6th Cir. 2007). A plaintiff seeks equitable restitution when "money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002); *see also Alexander*, 232 Fed. App'x at 500; *see also Aldridge*, 144 F.4th at 846 ("For this remedy to be equitable, the fiduciary must seek specific funds in the beneficiaries' possession—not a money judgment collectable from any of the beneficiaries' general assets.") (internal quotations and citations omitted).

Here, Plaintiff does not plausibly allege that restitution is an appropriate remedy. Indeed, she does not even address this form of relief in her response brief (nor even use the term "restitution" in her Amended Complaint). *See* [R. 15]; [R. 20]. Regardless, the Court finds that, even construing the pleadings in a light most favorable to the plaintiff and accepting all allegations as true, as the Court must at this stage, Plaintiff has failed to allege that she has any equitable interest in any *specific* funds held by the Sazerac Defendants. Indeed, to the extent Plaintiff paid premiums after coverage terminated, Plaintiff has already been fully refunded for the value of the premiums that she paid, as she acknowledges in her Amended Complaint. [R. 15, ¶¶ 51–52]. Nevertheless, she alleges that the premiums she paid to the Sazerac Defendants "are traceable to Plan assets and to items purchased (including insurance) by Defendants with the funds," [R. 15, ¶ 125], but she does not identify any specific assets held by these defendants, nor does she allege that any of these alleged assets were actually purchased with or funded by the premiums the Sazerac Defendants received from Plaintiff. *See Knudson*, 534 U.S. at 213; *see also Adridge*, 144 F.4th at 846 (explaining that equitable restitution traditionally cannot be invoked if the funds have already been spent on "nontraceable assets"); [R. 15, ¶ 129 (alleging that the funds can be traced to "general assets"). And again, the funds received from Plaintiff (the premium payments) were returned to Plaintiff, in full. Thus, Plaintiff in no way explains how the Sazerac Defendants were unjustly enriched by the receipt (and eventual return) of her premium payments.

Plaintiff's vague allegations that her premium payments can be traced to unspecified Plan assets and purchases do not establish that she holds an equitable claim to any such property. *See generally Knudson*, 534 U.S. at 213. She needed to identify *specific* assets she has an equitable interest in that are remaining in the Sazerac Defendants' possession, and she does not. *See Aldridge*, 144 F.4th at 846. Plaintiff's broad "tracing" language does not overcome this deficiency.

Accordingly, Plaintiff has not plausibly alleged that she seeks to "restore to the plaintiff particular funds or property in the defendant's possession," *id.* at 214, and thus has not plausibly alleged that restitution of an unjust enrichment is an appropriate remedy.

In sum, Plaintiff does not plausibly allege that she seeks a cognizable form of appropriate equitable relief for her § 1132(a)(3) breach of fiduciary duty claim (Count II). Simply put, the nature of the relief sought in the pleadings is not an available form of equitable relief. *See Alexander*, 232 Fed. App'x at 496–97.

## IV. CONCLUSION

For the reasons set forth above, the Court will grant the motions to dismiss. Accordingly, the Court being sufficiently advised, **IT IS HEREBY ORDERED** as follows:

1. The Sazerac Defendants' Motion to Dismiss Plaintiff's First Amended Complaint, [**R. 17**], is **GRANTED**.
2. Hartford Life's Motion to Dismiss Count I of the Amended Complaint, [**R. 18**], is **GRANTED**.
3. A separate judgment shall follow.

This the 29th day of September, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc: Counsel of Record